# IN THE UNTIED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

GLADYS DAVIS,             )
                                 )

        Plaintiff,           )         NO.  3:06-1106

                                 )         JUDGE HAYNES

v.                              )

                                 )

NISSAN NORTH AMERICA, INC.,    )

                                 )

        Defendant.        )

## M E M O R A N D U M

Plaintiff, Gladys Davis, filed this action under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2611 and the Tennessee Handicap Act ("THA") Tenn. Code Ann. § 8-50-103 against the Defendant, Nissan North America, Inc, her former employer.  Plaintiff asserts that Nissan denied her benefits and violated rights under the FMLA and THA.  Plaintiff also asserts a state law claim of retaliation for her exercise of her rights under Tennessee's worker's compensation law.  The Defendant filed an answer denying Plaintiff's allegations and the parties proceeded with discovery.

Before the Court is Nissan's motion for summary judgment (Docket Entry No. 15), contending in sum, that Nissan afforded Plaintiff all of her leave under the FMLA and that Plaintiff's THA claims fails in light of the medical proof that at the time of her termination, Plaintiff could not continue to work without significant risk of injury.  Defendant contends that such medical proof also precludes any finding of retaliatory motive for Plaintiff's state law claim. Plaintiff responds with recent medical proof that she was able to return to work at Nissan and that Nissan failed to inform Plaintiff of her FMLA rights.

## A. Findings of Fact[1]

Nissan hired Davis as a production technician on September 8, 1991. Plaintiff described her job as production technician as "hard work," "physically demanding," "fast pace[d]," and repetitive in nature. (Docket Entry No. 17-6 Plaintiff's Deposition at pp. 29-30). Plaintiff was reassigned to the pre-final line where there are three to five jobs and each job is rated for its strenuousness. (Docket Entry No. 17-15, Reese Deposition at p. 15). Each pod has the same range of high and low-rated jobs. Id. at pp. 15, 20. A Nissan employee must be able to perform all jobs within a pod. Id. at p. 17. Plaintiff's job involved "some pretty heavy lifting" and use of "some pretty big guns," with "a lot of overhead and outstretching of her arms either "up or out." Id. at pp. 14, 15 and 17.

By May, 2005, Plaintiff was assigned a carpet job involved picking up the whole piece of carpet, cutting it in half, fitting the carpet in the vehicle, and attaching it with push pins. The pieces of carpet weighed approximately 12 pounds. Id. at p. 16.

In her first eleven years at Nissan, Plaintiff had several injuries, including on May 12, 1992, January 13, 1995: April 10, 1995, September 14, 1995, October 18, 1995, November 5, 1996, March 3, 1998, February 18, 1999, July 14, 2000, October 3, 2001, June 24, 2002, and August 15, 2002. (Docket Entry No. 33-2, Plaintiff's Response to Defendant's Statement of

---

[1]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). The Court concludes that there are not any material factual disputes. Thus, this section constitutes finding of facts under Fed.R.Civ.P. 56(d).

Undisputed Facts at ¶ 7). Plaintiff had five additional work related injuries on April 13, 2003, March 11, 2004, April 1, 2004, November 3, 2004, and January 10, 2005. Id. at ¶ 8. Plaintiff had four surgical procedures: on April 21, 2004 for her right wrist, on May 2, 2005 for her left wrist, on September 30, 2005 for her right elbow, and on June 20, 2005 for her right shoulder. (Docket Entry No. 17-6, Davis Deposition at p. 22). For these surgeries and various injuries, by November 28, 2005, Plaintiff had four work related leaves of absence totaling 320 days. Id. These leaves of absence were from December 22, 1992 - January 6, 1993; from February 27, 2004 -March 8,2004; from April 2 1,2004 -July 16,2004; and from May 2,2005 through the present. (Docket Entry No. 17-8 at Exhibit 4).

As to her specific injuries, on May 19, 1992, Plaintiff complained of bilateral hand pain and numbness since May 12, 1992 due "work[ing] on the engine line doing a lot of fine hand movements such as assembling pistons." (Docket Entry No. 33-2, Plaintiff's Response to Defendant's State of Undisputed Facts at ¶ 10). Nissan assigned Plaintiff restrictive work that avoided "heavy gripping or twisting [and] no power tools right hand for six days." Id.

Dr. James K. Lanter, Plaintiff's physician diagnosed Plaintiff with "flexor tendonitis of both wrists with some symptoms of carpal tunnel syndrome while using her hands at work." Dr. Lanter attributed Davis' numbness "to using her hands in a gripping fashion at work and placed Davis on modified duty of "avoid[ing] power tools and repetitive gripping." Id. at ¶ 1. Dr. Lanter released Davis to full duty on June 15, 1992. Id. Upon her return, Nissan provided Plaintiff with an Impacto glove with a thumb pad for her left hand to decrease recurrence of her symptoms. Id. at ¶ 12. On December 22, 1992, Davis began a workers' compensation leave of absence until January 6, 1993. Id. at ¶ 13. On January 13, 1995, Davis reported right palm due

3

to pushing and twisting cable brackets. Id. at ¶ 14.

On April 10, 1995, Davis reported a left pectoral strain, while she was leaning over in a vehicle performing the bumper deck job. Id. at ¶ 15. On September 14, 1995, Davis reported a right hand strain caused by repetitively pushing pins into the fender liner. Id. at ¶ 16. Davis was told to "avoid repetitive use and pushing with [the] extended fingers [of her right hand] for the rest of [the] day." Id. On October 18, 1995, Davis reported a left shoulder strain resulting from lifting and "pulling down [on] the trunk of the cars," but returned to full duty. Id. at ¶ 17.

On November 5, 1996, Davis reported a left hand strain caused by "using a heavy air gun for a long period of time," but returned to duty. Id. at ¶ 18. On March 3, 1998, Plaintiff reported experiencing a foreign body in her right eye. Id. at ¶ 19. On February 18, 1999, Plaintiff complained of suffering a right wrist contusion (pinky injury). Exhibit 12. Dr. Tony Adams placed Plaintiff on temporary restrictions, but later Plaintiff returned to work. Exhibit 13.

On July 14, 2000, Plaintiff reported a thoracic strain with spasm resulting from "new job tools and [the] method of performing [her] job." Id. at ¶ 20. Dr . Adams set lifting, stooping, bending, and twisting restrictions for Plaintiff. Id. at ¶ 23. On October 3, 2001, Davis had a right wrist strain. Exhibit 16. Dr. Adams diagnosed as "thumb/wrist tendonitis," Exhibit 17 and placed Plaintiff on temporary restrictions, which Nissan accommodated. Id.

On June 24, 2002, Davis suffered a left elbow sprain, but returned to duty. Id. at ¶ 23. On August 15, 2002, Plaintiff sustained a right hand contusion, but returned to duty. Id. at ¶ 24. On April 3, 2003, Plaintiff had an injury to her right wrist from "rapid stringing usage," id. at ¶ 25 and Dr. Adams diagnosed Plaintiff with right hand tendonitis. Dr. Adams also referred Plaintiff to Dr. David M. Schmidt of Tennessee Orthopaedic Alliance and placed Plaintiff on

4

temporary restrictions that Nissan accommodated.  Id.

On October 30,2003, Plaintiff reported to Nissan a medical recurrence of her right hand pain and stated that "[my] right hand has hurt the worst it has ever hurt over this past weekend, and I need something done about it."  Id. at ¶ 26.  On November 3,2003, Plaintiff was placed on temporary modified duty.  Id. at ¶ 27.  Dr. Adams set restrictions on Plaintiff's use of her right hand.  Id.  Plaintiff returned to work at Nissan on November `7, 2003, but also complained of pain after the modified duty.  Id.  On December 2, 2003, Dr. Schmidt examined Plaintiff's right thumb and conducted a bone scan for her right wrist on December 8, 2003 as well as a CT scan on January 14, 2004.  Id. at ¶ 28.

On January 9, 2004, Dr. Schmidt  imposed temporary restrictions on Plaintiff's use of her right wrist.  Id. at ¶ 24.  On January 20, 2004, Dr. Schmidt released Plaintiff to return to work full duty.  Id.  On February 2, 2004, Davis reported to Nissan's medical clinic complaining of "severe pain" in her right hand and stating "I can't keep working like this."  Id. at ¶ 30.  On February 6,2004, Dr. Schmidt examined Plaintiff for wrist pain and restricted her use of her wrist to pound objects.  Id. at ¶ 31.

On February 24,2004, Plaintiff reported to Nissan medical with "severe pain" in her right hand and stated that "she is using the left hand and right elbow more since she is guarding the right hand and now these other areas right elbow and left hand are hurting."  Id. at ¶ 32. On February 26, 2004, Plaintiff returned to Nissan's medical clinic again complaining of "severe pain" in her right hand.  Id. at ¶ 33.   While "working on the line, Plaintiff felt a pop in the right hand and totally lost strength in her right hand with numbness and tingling."  Id.  Dr. Schmidt placed Plaintiff on a ten day temporary restriction of "no power tools, no gripping and no push

5

pull over 5 pounds or lifting over 5 pounds with the right hand." Id.

Plaintiff then took workers' compensation leave of absence from February 27,2004 through March 8, 2004. Id. at ¶ 34. On March 22 ,2004, Davis reported another injury to her right wrist and Dr. Schmidt placed Plaintiff on temporary leave. Id. at ¶ 35.

On April 21, 2004, Dr. Schmidt performed surgery on Plaintiff's right hand and set Plaintiff's temporary restrictions on Plaintiff's use of her right hand. Id. at ¶ 36. Plaintiff then began a workers' compensation leave of absence for 86 days until July 16, 2004. Id. Dr. Schmidt continued to see Plaintiff for follow-up visits on May 25, 2004 and June 22, 2004. Id. at ¶ 37. On August 4, 2004, Dr. Schmidt noted Plaintiff "wrist soreness and swelling" and that "sometimes [she] can hardly turn the key in her car." Id. at ¶ 38. Dr. Schmidt advised Plaintiff to continue wearing her wrist support and was concerned about "[r]eturning to repetitive use [that] may cause continuation of symptoms." Id. Plaintiff notes that prior to this visit, Nissan's physician had hold her to stop wearing the wrist support. Id.

On September 17, 2004, Plaintiff left a voice mail message with Nissan's medical clinic that her "wrist is hurting just as bad as it did before" and requested an earlier date for her next doctor's appointment. Id. at ¶ 39. Dr. Schmidt examined Plaintiff on September 29, 2004 and noted "she still has pain in her right wrist which hurts when she does her regular job" and that this pain "goes up to her elbow." Id. In response, Dr. Schmidt explained that Davis "has arthritic changes in her wrist" that causes the pain and that she had maximum recovery or improvement. Id.

On November 3, 2004, Davis reported to Nissan medical that with"the same movement over and over" in "lifting glass [and] bending [and] twisting on wires," she suffered a right wrist

6

strain.  Id. at ¶ 40.  On November 9 and 16, 2004, Dr. McHugh examined Plaintiff for her wrist

pain and advised Plaintiff to wear a splint while she slept and released her to return to work on

November 16,2004.  Id. at ¶ 41.  On March 15, 2004, Davis sustained an injury to her left

had/wrist and on March 18, 2004, Dr. Woodberry diagnosed Davis with a ganglion cyst on her

left hand and placed her on temporary restrictions.  Id. at ¶ 42.  On March 22, 2004, Dr. Schmidt

examined Plaintiff's right wrist and set temporary restrictions.  Exhibit 37.  On April 15, 2004,

Dr. Woodberry examined Plaintiff's left wrist injury.  Id.

On June 10, 2004, Dr. Woodberry continued Davis' temporary restrictions for her left

wrist and elbow.  Id. at ¶ 43.  On July 15, 2004, Dr. Woodberry removed his restrictions on

Davis' left wrist and Plaintiff returned to work on July 16, 2004.  Id. at ¶ 44.  After Davis's return

to work, Nissan assigned Plaintiff to a new work group for Maxima trim.  Id. at ¶ 55.  Plaintiff

wore an elbow brace, but reported to Nissan medical that her right elbow had "burning and

sticking pain."  Id..  In October, 2004 Davis underwent an MRI for her right elbow.  Id. at ¶ 52.

On November 30,2004, Dr. Schmidt noted that Davis "has failed conservative measures to date,"

and administered a cortisone shot, and imposed restrictions for ten days.  Id.  Davis returned to

modified duty in December, 2004.  Id.  On January 5, 2005, Plaintiff complained to Dr. Schmidt

that her elbow pain had not completely resolved, but "settled. . . down."  Id.  On January 10,

2005, Plaintiff reported a right shoulder strain that she attributed to "lifting overhead or up and

over moving."  Id. at ¶ 57.

On March 2, 2005, Davis informed Nissan medical that "Dr. Schmidt gave me a

cortisone shot in my elbow. It's still hurting."  Id. at ¶ 53.  On April 11, 2005, Dr. Blake Garside,

Jr., from workers' compensation panel of physicians examined Davis who reported that she had

7

"approximately a three-month history of pain in her right shoulder" which she attributed to "doing repetitive work including overhead and outstretched lifting." Id. at ¶ 58. Dr. Garside recommended "a short course of anti-inflammatories" as treatment. Id. This treatment was not successful and Davis saw Dr. Garside on April 29, 2005, and reported that her right shoulder pain was "worse than previously." Id. On March 17, 2005, Davis reported to Nissan medical that "I've got to have surgery. I'll do whatever it takes to get out of pain." Exhibit 51. On May 2, 2005, Dr. Woodberry performed surgery on Davis' left wrist and joint debridement and imposed restrictions on her work. Exhibit 52. Plaintiff also began another workers' compensation leave (Exhibit 53) that extended 30 months. Dove Deposition at p. 42.

On June 10, 2005, Plaintiff reported that her shoulder pain "recurred to the level it was previously," and elected to have shoulder surgery that Dr. Garside performed on June 20, 2005. Id. at ¶¶ 59-60. On June 30, 2005, Dr. Woodberry released his restrictions for Davis's use of her left hand, but due to Dr. Garside' shoulder restrictions, Plaintiff did not return to work, and continued on her workers' compensation leave. Exhibit 54.

On August 25, 2005, Philip G. Coogan, M.D., of Tennessee Orthopaedic Alliance Hand Care, examined Plaintiff's elbow, and noted that Davis "has had injections for tennis elbow with transient benefit." Id. at ¶ 54. On September 16, 2005, Dr. Garside placed temporary restrictions on Plaintiff until October 3, 2005. Id. at ¶ 61. On September 30, 2005, Dr. Coogan performed surgery on Davis' elbow and she remained on restrictions. Id. at ¶ 55. On October 28, 2005, Dr. Garside found Plaintiff had reached maximum improvement on her right shoulder and assigned her a 10% rating to her right upper extremity. Id. at ¶ 62. On November 9, 2005, Dr. Coogan placed right hand restrictions that Davis could not use power tools nor occasional

8

gripping and twisting, and her push and pull was limited to up to five pounds. Id. at ¶ 56. Dr. Coogan noted Davis as having a 2% impairment, Exhibit 73, but released Plaintiff to return to work with no restrictions for her right hand effective November 23, 2005. Id.

Nissan established a Comprehensive Medical Evaluation ("CME") for employees who sustain "multiple injuries and [had] multiple surgeries for multiple body parts," and who had been cleared by their attending physician to return safely to work and continue performing their production jobs at Nissan on a long-term basis. (Docket Entry No. 17-12, Dove Deposition at pp. 54-55). Nissan's CME evaluated employees with continued injuries in performing their job duties, to avoid the employee's inability to work. Id. at pp. 55-56.

Under this CME program, a committee decides whether the employee will undergo a comprehensive medical examination by an independent physician. Id. at p. 50. Dr. Renata Blum, who is board certified in internal, occupational, and preventive medicine conducts the comprehensive medical examination of Nissan's employees. (Docket Entry No. 17-12, Blum Deposition at p. 4). Dr. Blum evaluates an employee's medical condition "holistically," i.e., considering the employee's medical history on whether the employee can successfully return to work in the long term. (Docket Entry No. 17-12, Dove Deposition at p. 53). In evaluating whether an employee can return to work with restrictions, Nissan also has job placement specialists who evaluate the employee's ability to perform safely a particular job on a long term basis. (Docket Entry No. 17-1, Biter Deposition at p. 28).

As to Plaintiff, the CME Committee members were Loretta Kelso, R.N., lead nurse case and manager for Whole Health; Patrice Dixon, R.N., Nissan medical specialist; and Pat Biter, section manager, medical management. (Docket Entry No. 17-2, Dove Deposition at p. 44 and

9

Docket Entry No. 17-10, Dixon Deposition at p. 29). On November 28, 2005, this Committee summarized Davis's history of injuries and medical treatment to determine whether Davis could safely return to her job after Drs. Coogan's and Garside's medical releases. (Docket Entry No. 17-11).

This committee noted that Plaintiff "continues to experience upper extremity injuries including 7 work related leaves of absence" that resulted in 320 leave of absence days. (Docket Entry No. 17-10, Dixon Deposition at pp. 66-67 and Docket Entry No. 17-11 thereto). The Committee's concern was that Davis's continued work "may contribute to future new or exacerbation of past problems" and that "[her long term success [at Nissan] is a concern." Id. The CME committee requested that Davis undergo a "holistic" medical evaluation. (Docket Entry No. 17-10, Dixon Deposition at p. 29). On January 23, 2006, Dr. Blum evaluated Davis and reviewed Davis's medical records and her job duties and whether Davis could work on a long term basis. (Docket Entry No. 33-2, Plaintiff's Response to Defendant's Statement of Undisputed Facts at ¶¶ 67 and 68). Dr. Blum tested Plaintiff's abilities to lift her hands over her head, to stoop down and rise up, to hold her hands straight out, and perform other exercises. Id. at ¶ 74. Plaintiff who had not worked since May, 2005, and had a ganglion cyst removed from her left hand, that Plaintiff attributed to "repetitive use of her hands." Id. at ¶ 75. Prior to the surgery, Plaintiff experienced pain with any pressure on her left hand. Id. Plaintiff also reported a slight tear of the rotor cuff, that was caused by "a lot of lifting, repetitive lifting, lifting overhead of items weighing about five to ten pounds. Id. at ¶ 76. Plaintiff described her elbow pain as "caused by the lifting up," that was a "repetitive." Id. at ¶ 77. Plaintiff's 2004 surgery on her right hand to repair a "ligament" damage from repetitive usage. Id.

10

In sum, Dr. Blum described Plaintiff's work duties, as involving multiple activities for all her body areas" and "essentially repetitive" and opined this activities caused her present injuries requiring surgical treatment." Id. at ¶ 78. Dr. Blum concluded that despite "job-modified situations," that resulted in re-injury, Plaintiff had "failed conservative treatment and had to undergo surgery. Id. at ¶ 79. Blum rated Plaintiff within the "high" category of an adverse outcome and severity of the outcome. Id. at ¶ 81.

In a letter to Dr. Karen Oldham, Nissan's on-site medical director, Dr. Blum opined that "considering that she has had multiple injuries, four of which required surgery for correction and resolution of 'severe pain,' her likelihood of re-injury is considerable," that "for her own safety concern" and "due to her recurrent significant injuries that she has already experienced," it would pose "a risk for her to continue" her job at Nissan. Id. at ¶ 82.

Dr. Oldham, who is board certified in preventive medicine with a specialty in occupational and environmental medicine was responsible for deciding whether an employee should return to work. Id. at ¶ 83.

On January 25, 2006, Dr. Oldham also evaluated Davis, including Dr. Blum's examination and determined that Davis posed a high risk of injury, if she returned to Nissan. Id. at ¶¶ 84 and 85. Dr. Oldham told Plaintiff that it would not be safe for Plaintiff to return to Nissan. Id. at ¶ 85.

On February 8, 2006, Patrice Dixon, Glen Lewis, and Sheila Taylor, benefits specialists, met with Plaintiff to review her leave. Id. at ¶ 86. Dixon reviewed Nissan's various vocational programs that were available to Plaintiff. Id. at ¶ 88. After that meeting, Plaintiff remained on a leave of absence from Nissan and considered an active employee entitled to continue

11

participation in employee benefits and privileges for up to 30 months. Id. at ¶ 49.

When its employees take workers' compensation leave, Nissan provides its employees with a workers' compensation information packet. Id. at ¶ 90. This packet describes Nissan Benefit Information," and includes the following:

> Your leave of absence under Nissan's policy will run concurrently with any entitlement to leave that you have under the federal Family and Medical Leave Act. Please read the attached memo regarding your rights and obligations under the Family Medical and Leave Act.

> \*    \*    \*

> Your FMLA-covered absences will run simultaneously with leave under Company policies when you use: PTO; Accident and Sickness (A&S), salary continuation, or LTD benefits; Paid or unpaid workers' compensation leave; or Excused but unpaid absences under Nissan's policies.

Id. at ¶¶ 91 and 92. Nissan's employee handbook describes that "FMLA-covered leaves of absence will run simultaneously with paid or unpaid leave of absences that you take under Nissan's policies." Id. at ¶ 93. Plaintiff received a copy of Nissan's employee handbook. Id. at ¶ 94.

After Nissan's decision that she could not return to work and the February 8, 2006 leave meeting, Plaintiff reopened her workers' compensation claim for her January 10, 2005 right shoulder injury. Id. at ¶ 95. In the final settlement agreement, dated May 15, 2006, Plaintiff received an enhanced settlement of six times her medical impairment rating of six percent, and a total lump sum in excess of $72,000. Id. at ¶ 96.

In March, 1996, Nissan approved Davis' request to work while on her leave of absence as a care partner, or nurse's medical assistant, at Vanderbilt. Id. at ¶ 97. The care partner, job was less physically demanding and a "big difference" from Plaintiff's Nissan job. Id.

12

at ¶ 98.

In response to the Defendant's motion for summary judgment (Docket Entry No. 33), Davis submitted the affidavit of Dr. David Gaw, an orthopedic physician who opines that based upon his July 18, 2008 evaluation of Davis, she is able to return to work with a full range of motion. (Docket Entry No. 34, Gaw Affidavit). Plaintiff did not disclose Dr. Gaw as an expert witness. (Docket Entry No. 35, Defendant's Reply at p. 3).

## B. Conclusions of Law

"The very reason of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the opposing party was on notice that she had to come forward with all of her evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Accord, Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment 'shall be rendered forthwith if the pleadings, Depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.
>
> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing

13

> law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no `genuine issue for trial.'" Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989). But see Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Court in Celotex

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, Depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's

14

burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991)(quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrating the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989) (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby). Moreover, the Court of Appeals explained that

> The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

Street, 886 F.2d at 1480 (cites omitted). See also Hutt v. Gibson Fiber Glass Products, No. 89-5731 (6th Cir. filed September 19, 1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." quoting Liberty Lobby)).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

More important for present purposes, summary judgment will not lie if the

15

dispute about a material fact is `genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

\* \* \*

Progressing to the specific issue in this case, we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits.  If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.  The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.  The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- `whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'

Liberty Lobby, 477 U.S. at 248, 252, 106 S. Ct. 2505, 91 L.Ed.2d at 211-212, 214 (citation

omitted and emphasis added).

It is likewise true that

[I]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant.  Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated.  It has been stated that: `The purpose of the hearing on the motion for such a judgment is not to resolve factual issues.  It is to determine whether there is any genuine issue of material fact in dispute. . . .'

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation

omitted).  As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must

be read in a light most favorable to the party opposing the motion."  Duchon v. Cajon Company,

791 F.2d 43, 46 (6th Cir. 1986) app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion) (citation

omitted).

16

The Court of Appeals further explained the District Court's role in evaluating the proof on a summary judgment motion

> A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establishing a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New InterNational Dictionary (1986).

> Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989) cert. denied 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). Here, the parties have given some references to the proof upon which they rely. Local Rule 8(b)(7)(A) and (C) require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions

> 1. Complex cases are not necessarily inappropriate for summary judgment.

> 2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

> 3. The movant must meet the initial burden of showing `the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

> 4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

17

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: `whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6. As on federal directed verdict motions, the `scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the `old era' in evaluating the respondent's evidence. The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.' Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is `implausible.

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed

upon a motion for summary judgment: (1) has the moving party "clearly and convincingly"

established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to

establish all the elements of the asserted claim or defense?; (3) if factual support is presented by

the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment

under the applicable law?; and (4) are there any genuine factual issues with respect to those

18

material facts under the governing law?

As to his FMLA claim, FMLA establishes the right of any eligible employee to twelve weeks of leave during any twelve-month period for any one of several reasons, including a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1). Under the FMLA, employees are entitled to as much as twelve weeks of leave per year, but the employees must have worked at least 1,250 hours during that year to be eligible. 29 C.F.R. § 825.110(a) (2007).

A covered employer cannot "interfere with, restrain, or deny the exercise of or attempt to exercise any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1); Staunch v. Continental Airlines, Inc., 511 F.3d 625, 629 (6th Cir. 2008). When an employee alleges a deprivation of these substantive guarantees, the employee must demonstrate by a preponderance of the evidence, entitlement to the disputed leave. King v. Preferred Technical Group, 166 F.3d 887, 891 (7th Cir. 1999). The issue of the employer's subjective intent is immaterial. Id. The critical issue is whether the employer provided its employee the entitlements under the FMLA – for example, a twelve-week leave or reinstatement after a medical leave. Hodgens v. General Dynamics Corp., 144 F.3d 151, 159 (1st Cir. 1998).

Where an employer has violated the Act, the employee is entitled to compensatory damages equal to the amount of any wages, salary, employment benefits, or other compensation which she was denied or lost as a result of the violation, interest on the compensatory damages and, unless the court concludes that the employer acted in good faith and reasonably believed it had complied with the Act, liquidated damages equal to the amount of compensatory damages plus interest. 29 U.S.C. § 2617(a)(1)(A). Finally, an employer is liable for equitable relief, if

19

appropriate, including reinstatement. 29 U.S.C. § 2617(a)(1)(B).

For her FMLA claims, Plaintiff must show that she had a right to leave under 29 U.S.C. §§ 2611-12, and that the employer interfered with that right in violation of 29 U.S.C. § 2615. Rhoads v. F.D.I.C., 956 F. Supp. 1239, 1251 (D. Md. 1997). To demonstrate her right to leave under the FMLA, the employee must prove: (1) that she was an eligible employee, as defined by the Act, 29 U.S.C. § 2611(2); (2) that the employer was an eligible employer under the Act, 29 U.S.C.A. § 2611(4); (3) that there was a qualified reason for the leave, here a "serious health condition," 29 C.F.R. § 825.114; 29 U.S.C. § 2611(11); and (4) that there was proper notice given to the employer, 29 C.F.R. §§ 825.302-.305.

The Sixth Circuit summarized an employer's burden to demonstrate that an employee has not met the minimum hours requirement under the FMLA:

> To determine if an employee has worked the requisite 1,250 hours for his employer, the FMLA directs courts to examine the principles for calculating hours of service established under the Fair Labor Standards Act ("FLSA"). 29 U.S.C. § 2611(2)(C). "The determining factor is the number of hours an employee has worked for the employer within the meaning of the FLSA . . . . Any accurate accounting of actual hours worked under FLSA's principles may be used." 29 C.F.R. § 825.110(c) (emphasis added). If the "employer does not maintain an accurate record of hours worked by an employee . . . the employer has the burden of showing that the employee has not worked the requisite hours." Id.

Staunch, 511 F.3d at 629-30.

An employer can count FMLA leave days concurrent with leave under an employer's policy or other leave. "FMLA leave is not dependent upon the absence of earned leave. Specifically, "when an employee's leave qualifies both under the FMLA and under the employer's paid leave policy[,] the employer may either permit the employee to use his FMLA

20

appropriate, including reinstatement. 29 U.S.C. § 2617(a)(1)(B).

For her FMLA claims, Plaintiff must show that she had a right to leave under 29 U.S.C. §§ 2611-12, and that the employer interfered with that right in violation of 29 U.S.C. § 2615. Rhoads v. F.D.I.C., 956 F. Supp. 1239, 1251 (D. Md. 1997). To demonstrate her right to leave under the FMLA, the employee must prove: (1) that she was an eligible employee, as defined by the Act, 29 U.S.C. § 2611(2); (2) that the employer was an eligible employer under the Act, 29 U.S.C.A. § 2611(4); (3) that there was a qualified reason for the leave, here a "serious health condition," 29 C.F.R. § 825.114; 29 U.S.C. § 2611(11); and (4) that there was proper notice given to the employer, 29 C.F.R. §§ 825.302-.305.

The Sixth Circuit summarized an employer's burden to demonstrate that an employee has not met the minimum hours requirement under the FMLA:

> To determine if an employee has worked the requisite 1,250 hours for his employer, the FMLA directs courts to examine the principles for calculating hours of service established under the Fair Labor Standards Act ("FLSA"). 29 U.S.C. § 2611(2)(C). "The determining factor is the number of hours an employee has worked for the employer within the meaning of the FLSA . . . . Any accurate accounting of actual hours worked under FLSA's principles may be used." 29 C.F.R. § 825.110(c) (emphasis added). If the "employer does not maintain an accurate record of hours worked by an employee . . . the employer has the burden of showing that the employee has not worked the requisite hours." Id.

Staunch, 511 F.3d at 629-30.

An employer can count FMLA leave days concurrent with leave under an employer's policy or other leave. "FMLA leave is not dependent upon the absence of earned leave. Specifically, "when an employee's leave qualifies both under the FMLA and under the employer's paid leave policy[,] the employer may either permit the employee to use his FMLA

20

leave and paid sick leave sequentially, or the employer may require that the employee use his FMLA leave entitlement and his paid sick leave **concurrently**." Ney v. City of Hoisington, Kansas, 264 Fed.Appx. 678, 68 n.1 (10th Cir. 2008); (quoting Strickland v. Water Works & Sewer Bd. of Birmingham, 239, F.3d 1199, 1205, (11th Cir. 2001) and citing Slentz v. City of Republic, 448 F.3d 1008, 1010 (8th Cir. 2008) (emphasis added)).

Here, the undisputed facts are that between May 2005 and January 2006, Davis had twelve weeks of leave. Moreover, another undisputed fact is that Davis received actual notice that her worker's compensation leave would run concurrent with any FMLA leave. In these circumstances, the FMLA is not violated for lack of prejudice. Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002).

As to Plaintiff's state law claims under the THA and for retaliatory discharge, without a viable federal claim, the Court declines to exercise its supplemental jurisdiction over Plaintiff's state law claim that is dismissed without prejudice. Wal-Juice Bar, Inc. v. Aleut, 899 F.2d 1502, 1504 (6th Cir. 1990) (after granting summary judgment on federal claim, court should have dismissed the state law claims).

Accordingly, the Defendant's motion for summary judgment should be granted to Plaintiff's FMLA claim, but Plaintiff's state law claims are dismissed without prejudice.

An appropriate Order is filed herewith.

**ENTERED** this the ___27th___ day of October, 2008.

WILLIAM J. HAYNES, JR.
United States District Judge

21